**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

**Advanced Respiratory, Inc.,** **Civil No. 00-2646 (DWF/SRN)**

**Plaintiff,**

v.

**ORDER**

**Electromed, Inc.,**

**Defendant.**

---

Cyrus A. Morton, Esq., on behalf of Plaintiff.

Paul A. Koches, Esq. and William J. George, Esq., on behalf of Defendant.

---

SUSAN RICHARD NELSON, United States Magistrate Judge

The above-entitled matter came before the undersigned United States Magistrate Judge on June 20, 2002, on Defendant's Motion to Compel Discovery of Fish & Richardson Patent Opinion Document.

This Order addresses that Motion.

## I. Factual Background.

In the present case, Plaintiff has brought claims that Defendant's product, the Medpulse 2000, infringes Plaintiff's U.S. Patent No. 6,036,662 (the '662 Patent), and the University of Minnesota's U.S. Patent No. 4,838,263 (the '263 Patent).[1]

On November 2, 1998, Plaintiff (formerly named American Biosystems, Inc.) entered into

---

[1]The following paragraph of this Order will outline the business arrangement by which Plaintiff is able to bring suit for infringement of the University of Minnesota's patent.

FILED JUL 23 2002
RICHARD D. SLETTEN, CLERK
JUDGMENT ENTD
DEPUTY CLERK

a license agreement with the University of Minnesota (University). (Affidavit of Cyrus Morton (Morton Aff.); Ex. A.) Under this agreement, Plaintiff was granted an exclusive license to commercialize the technology encompassed in U.S. Patent Application No. 045,888 (the '045,888 Application), filed May 1, 1987. Id. The '263 Patent was one of the patents which issued from this application. (Morton Aff.; Ex. B.) The license agreement states, "[t]he UNIVERSITY desires to enter into a license arrangement with a company that will commercialize this invention and that will fund additional UNIVERSITY research concerning the invention, including research to develop other therapeutic and diagnostic applications." (Morton Aff.; Ex. A.) If Plaintiff determines that a third party may be infringing the patents covered by this agreement, Plaintiff may "at its sole option, bring suit against such alleged infringer in its name or the UNIVERSITY's name or in both names as may be required to establish jurisdiction." Id.

The agreement required the University to prosecute all U.S. and foreign patents requested by Plaintiff, that were based on the '045,888 Application. Id. The University could also prosecute patents based on that Application that were not requested by Plaintiff. Id. In the former case Plaintiff would bear the expense of prosecution, and in the latter case the University would.

At the same time that Plaintiff was participating in its agreement with the University, it was also attempting to improve on the original designs and product concepts that resulted from the '263 Patent. One of the products Plaintiff created was the Model 103 ThAIRapy® Vest (Model 103). With the development of the Model 103, it became necessary to determine whether this product was covered by the '263 Patent. Consequently, on December 23, 1996, Plaintiff and

the University entered into a nondisclosure agreement by which they could share information necessary to make this determination. (Morton Aff.; Ex. C.) This agreement stated that "COMPANY and UNIVERSITY desire to mutually determine if these improvements are covered by the UNIVERSITY's inventions." Id. It further provided that the information disclosed by either party would remain the property of that party after disclosure. Id. Throughout this time, Plaintiff and the University retained separate counsel. (Morton Aff.; Ex. D.)

In order to determine whether the Model 103 infringed any of the University's patents, the University reviewed the product itself, the original patent application, and a patent infringement opinion from the Fish & Richardson law firm (Fish & Richardson), which was commissioned by Plaintiff. (Morton Aff.; Ex. E.) The University's representative and one of its lawyers each reviewed the Fish & Richardson opinion on Plaintiff's premises, but neither individual was permitted to remove the opinion from there. (Affidavit of James A. Severson.) By October 14, 1997, Plaintiff and the University had both concluded that the Model 103 did not infringe any of the University's patents. (Morton Aff.; Exs. D&E.)

Plaintiff and the University continued their business relationship after the Model 103 was developed. Plaintiff continued to make royalty payments on the earlier Model 102, which was covered by the '263 Patent, through November 2000. (Morton Aff.; Ex. F.) Defendant now seeks disclosure of the Fish & Richardson opinion.

## II. DISCUSSION

### A. Relevance Standard.

Federal Rule of Civil Procedure 26(b)(1) provides:

> In General. Parties may obtain discovery regarding any matter, not privileged, which is relevant to the subject matter involved in the

> pending action, whether it relates to the claim or defense of the party seeking discovery or to the claim or defense of any other party . . . The information sought need not be admissible at the trial if the information appears reasonably calculated to lead to the discovery of admissible evidence.

The Eighth Circuit has considered the breadth of Rule 26 and the possible abusive discovery requests which can result from it.

> Rule 26(b) of the Federal Rules of Civil Procedure is widely recognized as a discovery rule which is liberal in scope and interpretation, extending to those matters which are relevant and reasonably calculated to lead to the discovery of admissible evidence. *Kramer v. Boeing Co.*, 126 F.R.D. 690, 692 (D. Minn. 1989) (and cases cited therein). While the standard of relevance in the context of discovery is broader than in the context of admissibility (Rule 26(b) clearly states that inadmissibility is no grounds for objection to discovery), *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 98 S.Ct. 2380, 57 L.Ed.2d 253 (1978), *Culligan v. Yamaha Motor Corp., USA*, 110 F.R.D. 122 (S.D. N.Y. 1986), this often intoned legal tenet should not be misapplied so as to allow fishing expeditions in discovery. Some threshold showing of relevance must be made before parties are required to open wide the doors of discovery and to produce a variety of information which does not reasonably bear upon the issues in the case.

Hofer v. Mack Trucks, Inc., 981 F.2d 377 (8th Cir. 1992).

## B. Choice of Law Concerning Privilege.

The Federal Rules of Evidence state the following with respect to evidentiary privileges:

> Except as otherwise required by the Constitution of the United States or provided by Act of Congress or in rules prescribed by the Supreme Court pursuant to statutory authority, the privilege of a witness, person, government, State, or political subdivision thereof shall be governed by the principles of the common law as they may be interpreted by the courts of the United States in the light of reason and experience. However, in civil actions and proceedings, with respect to an element of a claim or defense as to which State law supplies the rule of decision, the privilege of a witness, person, government, State, or political subdivision thereof shall be determined in accordance with State law.

Fed. R. Evid. 501. "In general, federal privileges apply to federal law claims, and state privileges apply to claims arising under state law." Pearson v. Miller, 211 F.3d 57, 66 (3rd Cir. 2000).

### C. **Federal Privilege Law.**

In Diversified Indus., Inc. v. Meredith, 572 F.2d 596, 609 (8th Cir. 1977), the Eighth Circuit established the standard for attorney-client privilege when dealing with corporations. It stated,

> the attorney-client privilege is applicable to an employee's communication if (1) the communication was made for the purpose of securing legal advice; (2) the employee making the communication did so at the direction of his corporate superior; (3) the superior made the request so that the corporation could secure legal advice; (4) the subject matter of the communication is within the scope of the employee's corporate duties; and (5) the communication is not disseminated beyond those persons who, because of the corporate structure, need to know its contents. We note, moreover, that the corporation has the burden of showing that the communication in issue meets all of the above requirements.

Id.

"Voluntary disclosure is inconsistent with the confidential attorney-client relationship and waives the privilege." In re Grand Jury Proceedings, 841 F.2d 230, 234 (8th Cir. 1988). In certain circumstances, however, such as the joint-client doctrine and the community of interest doctrine, disclosures do not automatically waive the attorney-client privilege. The Federal Circuit explained the doctrines as follows:

> The protection of communications among clients and attorneys "allied in a common legal cause" has long been recognized. As one court explained:
>
> > [W]here there is consultation among several clients and their jointly retained counsel, allied in a common legal cause, it may reasonably be inferred that resultant disclosures are intended to be insulated from exposure beyond the confines

> of the group; that inference, supported by a demonstration that the disclosures would not have been made but for the sake of securing, advancing, or supplying legal representation, will give sufficient force to a subsequent claim to the privilege.
>
> *In re Grand Jury Subpoena Duces Tecum*, 406 F.Supp. 381, 386 (S.D.N.Y.1975). The issue has previously arisen in connection with patent rights. *See, e.g., Baxter Travenol Labs., Inc. v. Abbott Labs.*, 1987 WL 12919, *1 (N.D.Ill. June 19, 1987) ("A community of legal interests may arise between parties jointly developing patents; they have a common legal interest in developing the patents to obtain greatest protection and in exploiting the patents."); *SCM Corp. v. Xerox Corp.*, 70 F.R.D. 508, 514 (D.Conn.) ("Whether the legal advice was focused on pending litigation or on developing a patent program that would afford maximum protection, the privilege should not be denied when the common interest is clear."), *appeal dismissed*, 534 F.2d 1031 (2d Cir.1976).

In re Regents of University of California, 101 F.3d 1386, 1389 (Fed. Cir. 1996).

In order for the community of interest doctrine to apply, "clients must share a common legal interest, with respect to the subject of the communications." Id. at 1390. Subsequent courts have understood In re Regents to require that the interests be "identical, not similar, and be legal, not solely commercial." Katz v. AT&T Corp., 191 F.R.D. 433, 437 (E.D. Penn. 2000).

**D. The Parties' Positions.**

Defendant argues that the Fish & Richardson opinion letter is relevant and discoverable. It states,

> the legal opinion supporting ARI's asserted non-infringement of the '263 Patent would certainly shed light on the question of whether or not Electromed's device infringes that patent. It may also be relevant in establishing an estoppel defense by Electromed to the extent the proffered reasons for the opinion of ARI's non-infringement of the '263 Patent may be inconsistent with the arguments it is advancing against Electromed for infringement.

Defendant states that it has been accused of infringement under the doctrine of equivalents. Therefore, according to Defendant, Plaintiff is claiming that the Model 103 is equivalent to the Medpulse 2000, but that the Model 103 does not infringe the '263 Patent, while the Medpulse 2000 does. The apparent inconsistency in these statements is highly relevant to the present case, according to Defendant. Further, while the Fish & Richardson opinion may not matter for claim construction, Defendant states that it will be relevant for the ultimate jury question of whether the Medpulse 2000 infringes the '263 Patent. Defendant also believes the issue could potentially justify a summary judgment argument.

With respect to privilege, Defendant cites Eighth Circuit law, and asserts that "matters cannot be protected by the attorney-client privilege unless they are kept confidential, and that a knowing disclosure of such matters to a third party (who is not the client) constitutes a waiver of the privilege." Defendant argues that any contractual duty of nondisclosure Plaintiff owed to the University is separate from the question of whether it waived the attorney-client privilege by disclosing the opinion. Hence, the nondisclosure agreement should not defeat Defendant's motion.

Defendant also states that the community of interests doctrine should not apply in the present case. Regardless of their other shared interests, Defendant explains that Plaintiff and the University had adverse interests at the time the opinion was shared. Specifically, the University hoped to determine that the Model 103 fell under the '263 Patent, because Plaintiff would then owe royalties for it. Plaintiff, on the other hand, hoped to show that the Model 103 did not, so that no royalties would be owed.

Defendant emphasizes that in each of the cases in which courts have applied the

community of interest doctrine, the parties have had the same legal interest. As examples, Defendant cites In re Regents, Hewlett-Packard Co. v. Bausch & Lomb, Inc., 115 F.R.D. 308 (N.D. Cal. 1987), and Tenneco Packaging Specialty & Consumer Products, Inc. v. S.C. Johnson & Son, Inc., 1999 WL 754748 (N.D. Ill. 1997). Addressing Hewlett Packard specifically, Defendant explains that although the parties sharing the community of interest were a buyer and a seller, and thus appeared to have adverse interests, the relevant issue was the patent that was being transferred through the sale. With respect to this issue, Defendant states that both parties shared the identical interest in the validity of the patent.

Defendant further distinguishes Hewlett Packard from the present case, by noting that the court in Hewlett Packard found the facts presented very little risk of "truth garbling." In the present case, however, Defendant argues there is a risk of "truth garbling" because Plaintiff found the Model 103 did not fall under the '662 Patent, but claims that Defendant's Medpulse 2000 infringes the '662 Patent and Plaintiff's own patent.

Plaintiff responds that the community of interest doctrine does apply to its disclosure of the Fish & Richardson opinion to the University, and so the opinion remains privileged. Plaintiff explains that it was helping the University develop important medical products, and urges the Court to further that interest by not finding the attorney-client privilege was waived. Plaintiff also states that the Fish & Richardson opinion is irrelevant.

Citing the same three community of interest cases as Defendant, Plaintiff states that they establish three factors which weigh against finding a waiver. They are: (1) the existence of an exclusive license; (2) the existence of a confidentiality agreement or confidentiality procedures with respect to the documents in question; and (3) the undesirability of finding waiver with an

opinion that is not being relied upon for purposes of the litigation. Plaintiff states that all of these factors exist in the present case.

Plaintiff concedes that it and the University had differing commercial interests concerning the Model 103. It argues, however, that they shared the same legal interest in maintaining the validity of the '263 Patent. Plaintiff supports this point by observing that the nondisclosure agreement stated the parties sought to "mutually determine" whether Plaintiff's improvements were covered by the University's inventions. According to Plaintiff, the community of interest doctrine applies as long as the legal interests are the same, regardless of the commercial interests. Therefore, it should apply in the present case.

Plaintiff states that disclosing the Fish & Richardson opinion would present a significant risk of "truth garbling" in the present case. It explains that Defendant is attempting to make a semantic argument that is legally incorrect. Plaintiff explains that there is no inconsistency in finding that the Model 103 falls under its '662 Patent, but not under the University's '263 Patent, while finding that the Medpulse 2000 infringes both patents. It states that the Model 103 and the Medpulse 2000 are entirely different products.

Moreover, Plaintiff stresses that its own commercial embodiment of its patent is not relevant to claim construction, and is only relevant to damages in the form of lost profits. Plaintiff also explains that it is claiming literal infringement of the two patents, rather than infringement based on the doctrine of equivalents. In this context, according to Plaintiff, the Fish & Richardson letter is only useful for determining how its patent is to be interpreted. That determination, however, is a question of law for the Court. Consequently, Plaintiff states that the opinion is irrelevant to the present case. Moreover, Plaintiff states that it has never argued that

the Model 103 was the commercial embodiment of the '263 Patent, thus, the Fish & Richardson opinion is consistent with Plaintiff's position the entire time. Thus, whatever use Defendant would make of the opinion would be inappropriate.

Plaintiff adds that it has never disclosed any part of the opinion before. Hence, maintaining the privilege would not mislead the Court, or damage Defendant. Plaintiff also emphasizes that it guarded the Fish & Richardson opinion's confidentiality more carefully than in other cases in which courts have applied the community of interest doctrine. Plaintiff explains that no copies of the document were ever made, and the University was only permitted to observe it on Plaintiff's premises. Therefore, Plaintiff concludes that Defendant's motion should be denied.

**E. The Court's Order.**

The Court grants Defendant's motion. The Fish & Richardson opinion is relevant to the present case. While the opinion may be irrelevant to claim construction, the conclusion that the Model 103 could fall under Plaintiff's '662 Patent while not infringing the University's '263 Patent, is clearly relevant to the larger argument that Defendant's Medpulse 2000 infringes both. The Fish & Richardson opinion is relevant for at least two reasons. It provides a potential inconsistency with Plaintiff's current position. And regardless of the consistency issue, it may contain opinions regarding the '662 Patent that would be useful to Defendant in arguing that the Medpulse 2000 does not infringe.

The Fish & Richardson opinion is also discoverable, because Plaintiff waived its attorney-client privilege. The Court acknowledges that in the present case there was an exclusive license agreement, and a confidentiality agreement. But because the parties had adverse interests

concerning the Model 103, those facts can not justify finding a community of interest. Plaintiff and the University's adverse interests distinguish this case from the three cases Plaintiff cites to when claiming privilege.

Plaintiff quotes the court in In re Regents stating that the parties "had the same interest in obtaining strong and enforceable patents." 101 F.3d at 1390. This was clearly the case, but it does not lead to the conclusion Plaintiff urges in the present case. In In re Regents, the University of California and Eli Lilly were involved in what became an exclusive license agreement. Id. at 1388-89. The communications between these individuals, however, concerned prior art and other facts relating to the validity of the University of California's patent. Id. Hence, they had the same interest in the patent's enforceability and that was the only interest involved.

In the present case, Plaintiff and the University had a shared interest in the validity of the '263 Patent. But they were exchanging information concerning a different question. Plaintiff disclosed the Fish & Richardson opinion to demonstrate to the University that the Model 103 did not fall under the '263 Patent. This was a point on which Plaintiff and the University had different interests. The exchange did not concern the larger issue of the '263 Patent's validity.

Further, the Court is not persuaded by Plaintiff's argument that regardless of the differing commercial interests, it and the University still shared the same legal interest in maintaining the validity of the '263 Patent. The Court accepts that in a more general sense both Plaintiff and the University shared an interest in maintaining the validity of the '263 Patent. But that is not a distinction between commercial and legal interests. It is, instead, a distinction between the larger license agreement, and actual issue at hand. In this case, the Court can find no meaningful

distinction between commercial and legal interests. Plaintiff and the University shared an interest in the validity of the '263 Patent that was both legal and commercial. The question of validity is a legal issue, and Plaintiff and the University both shared an interest in maintaining the validity, because it would facilitate each of their commercial interests. But with respect to the Model 103, they had adverse interests that were both legal and commercial. Plaintiff's interest in not having to pay royalties meant it also had a legal interest in determining the Model 103 did not fall under the '263 Patent. And the University had the opposite commercial and legal interests from Plaintiff. Plaintiff and the University's decision to "mutually determine" the legal status of the Model 103 does not imply that they both hoped to reach the same conclusion.

In SCM Corp. v. Xerox Corp., 70 F.R.D. 508 (D. Conn. 1976), a court dealt with a similar problem. In SCM, the question was whether one party had waived the attorney-client privilege by sharing antitrust analysis with its joint venturer. Id. The court found that the larger joint venture did not imply that the two companies shared the same interest in all of their exchanges. It explained as follows:

> Rank's interest in the negotiations does not appear to be that of a potential co-defendant in a possible antitrust action. Rather, it was negotiating the price for relinquishing voting and managerial control in Rank-Xerox to its formerly equal partner. On that issue the parties were not commonly interested, but adverse, negotiating at arm's length a business transaction between themselves.
>
> The differing business interests of Xerox and Rank are apparent from the course of the 1968-69 negotiations. The communications in question took place during protracted negotiations between joint venturers, but were not directed at advancing the joint interest vis-a-vis the rest of the world. Instead the parties were negotiating a business proposition between themselves. That the overall profitability of the joint enterprise was a consideration in which both parties' interests converged does not lessen the significance of their divergent interests.

Id. at 513. Similarly, in the present case, the larger license agreement does not produce a community of interest for the present issue.

The Court acknowledges that there was a nondisclosure agreement in the present case. And Plaintiff correctly observes that in the three cases it cites there were also confidentiality agreements. But a confidentiality agreement can not produce a community of interest. In In re Regents, Hewlett-Packard, Tenneco, the courts specified that the individuals must have the same interest with respect to the subject matter in question. If a confidentiality agreement had been dispositive of the issue, those courts would not have had to go to the work of determining if the interests were the same. The same is true of any question of "truth garbling." Absent a community of interest, the possibility of "truth garbling" can not reverse the effects of voluntarily disclosing a previously privileged communication. As a result, Plaintiff waived its attorney-client privilege with respect to the Fish & Richardson opinion, and it should be produced.

**THEREFORE, IT IS HEREBY ORDERED that:**

Defendant's Motion to Compel Discovery of Fish & Richardson Patent Opinion Document is **GRANTED**.

Dated: July 22, 2002

Susan Richard Nelson

SUSAN RICHARD NELSON
United States Magistrate Judge